

AO 91 (Rev. 11/11) Criminal Complaint

FILED
11/2/2021
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AUSA Edward A. Liva, Jr. (312) 886-7647
AUSA Kristen Totten (312) 353-5340

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JORGE LUIS MALDONADO BERNABE;
JOSE ALFREDO MALDONADO VALENCIA,
        also known as "Guero" or "Wero";
CLAUDIA MALDONADO VALENCIA;
JUAN CARLOS MALDONADO,
        also known as "Palla" or "Paya";
ANTONIO CAMPUZANO-GARCIA; and
JUVENITO SOTO-GARCIA

CASE NUMBER:   21 CR 674
**UNDER SEAL**

## CRIMINAL COMPLAINT

    I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

### Count One

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Sections 841(a)(1) and 846 | Beginning no later than on or about November 8, 2020, and continuing through on or about September 19, 2021, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendants JORGE LUIS MALDONADO BERNABE, JOSE ALFREDO MALDONADO-VALENCIA, also known as "Wero" or "Guero," CLAUDIA MALDONADO-VALENCIA, and JUAN CARLOS MALDONADO, a/k/a "Paya" or "Palla", conspired with each other, and with others known and unknown, to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1); all in violation of 21 U.S.C. § 846. |

**Count Two**

*Code Section*

Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2

*Offense Description*

On or about November 22, 2020, at Chicago, in the Northern District of Illinois, and elsewhere, defendants JORGE LUIS MALDONADO BERNABE, JOSE ALFREDO MALDONADO-VALENCIA, and JUVENITO SOTO-GARCIA knowingly and intentionally distributed a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

**Count Three**

*Code Section*

Title 21, United States Code, Sections 841(a)(1)

*Offense Description*

On or about July 9, 2021, at Chicago, in the Northern District of Illinois, and elsewhere, defendant ANTONIO CAMPUZANO-GARCIA knowingly and intentionally possessed with intent to distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1).

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

THOMAS KROPP
Task Force Officer, Federal Bureau of Investigation (FBI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: November 2, 2021

*Judge's signature*

City and state: Chicago, Illinois

Gabriel A. Fuentes, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS    ss

## AFFIDAVIT

I, Thomas Kropp, being duly sworn, state as follows:

## I.   INTRODUCTION

1.    I am a Task Force Officer with the United States Department of Justice, Federal Bureau of Investigation and have been so employed since 2021. I have been a sworn law enforcement officer since 2014 with the North Chicago Police Department. I am currently assigned to the FBI Chicago Field Division, North Resident Agency ("NRA") and my responsibilities include investigating wholesale narcotics distributors and Mexican drug trafficking organizations. I am an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.    I have received training in and have experience investigating violations of federal narcotics laws including, but not limited to, Title 21, United States Code, Sections 841, 843, and 846. I have participated in numerous investigations involving a variety of investigative techniques, including physical and electronic surveillance; controlled purchases and deliveries of narcotics; the analysis of a wide variety of records and data, including pen register and trap and trace data as well as cellular phone location data; and the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and

importation of controlled substances. In addition, I have received specialized training in Title III investigations and have participated in several Title III investigations as a case agent, co-case agent, monitor, and surveillance agent.

3. Through these investigations, my training and experience, and conversations with other law enforcement officers, I have become familiar with the methods used by narcotics traffickers to distribute, transport, store, import, and safeguard controlled substances. I know that narcotics trafficking organizations have developed several methods to insulate their illegal activities from law enforcement detection. For instance, I know that members of narcotics trafficking organizations routinely utilize electronic communications facilities, including cellular telephones, to communicate operational directives and information concerning the conduct of the organization's illegal activities to other organization members; that organization members routinely use coded references in an effort to avoid law enforcement detection; that cell phones are often purchased through prepaid accounts using false identities to thwart the use of subpoenas to identify members of the organization; and that the communication of time-sensitive information is critical to the successful conduct of these organizations' illegal activities. I am also familiar with narcotics traffickers' use of cellular phones, land line phones, public phones, debit calling cards, counter-surveillance, and the use of false fictitious identities. Finally, I am familiar with the coded language used by narcotics traffickers during conversations to disguise the true meaning of their conversations.

2

4.     This Affidavit is made in support of a criminal complaint charging defendants with violations of controlled substances offenses, in violation of Title 21, United States Code, Sections 841 and 846, as outlined below. Because this Affidavit is being submitted for the limited purpose of establishing probable cause to support the criminal complaint and the issuance of arrest warrants against the proposed defendants, it contains only a summary of relevant facts. I have not included each and every fact known to me concerning the entities, individuals, and events described in this Affidavit. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offenses alleged in the complaint.

5.     I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) reports and information provided by other law enforcement officers, including oral and written reports that I have received from other law enforcement officers; (b) telephone records, including subscriber information, toll records, pen registers, and trap and trace information, and phone location monitoring; (c) information obtained from consensually recorded conversations and in-person meetings and judicially authorized intercepted communications; (d) the results of physical surveillance conducted by other law enforcement officers; (e) information provided by a confidential source, who provided information to law enforcement agencies; (f) information obtained from driver's license and automobile registration records; (g) information from public records and law enforcement databases; (h) my

3

training and experience; and (i) the training and experience of other law enforcement officers involved in this investigation.

6.     As set forth below, there is probable cause to believe that the defendants have committed violations of federal criminal law as follows:

a.     Beginning no later than on or about November 8, 2020 and continuing until at least on or about September 19, 2021, at Chicago, in the Northern District of Illinois and elsewhere, defendants JORGE LUIS MALDONADO BERNABE ("BERNABE"), JOSE ALFREDO MALDONADO-VALENCIA ("MALDONADO"), also known as "Wero" or "Guero," CLAUDIA MALDONADO-VALENCIA ("VALENCIA"), and JUAN CARLOS MALDONADO, also known as "Paya" or "Palla" ("JUAN CARLOS") did conspire with each other, and with others known and unknown, to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 846.

b.     On or about November 22, 2020, at Chicago, in the Northern District of Illinois, and elsewhere, BERNABE, MALDONADO, and JUVENTINO SOTO-GARCIA ("SOTO-GARCIA") knowingly and intentionally distributed a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

4

c. On or about July 9, 2021, at Chicago, in the Northern District of Illinois, and elsewhere, ANTONIO CAMPUZANO-GARCIA ("CAMPUZANO") knowingly and intentionally possessed with intent to distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

## II. OVERVIEW OF THE INVESTIGATION

### A. The Drug Trafficking Organization and the Defendants' Roles

7. Since approximately 2019, law enforcement officials have conducted a criminal investigation into a drug trafficking organization (the "BERNABE DTO") operated by BERNABE involving BERNABE's children, MALDONADO, VALENCIA, and JUAN CARLOS. During the course of the conspiracy, the BERNABE DTO used multiple locations to possess and distribute narcotics, including BERNABE's residence located on the 4200 block of West 83rd Street, Chicago, Illinois (the "BERNABE Residence"[1]) and the home of his son and daughter, VALENCIA and

---

[1] Throughout the course of the investigation, law enforcement officials conducted surveillance on the BERNABE Residence. On multiple occasions, including, as discussed below, on or about July 9, 2021 and August 23, 2021, law enforcement officials observed BERNABE entering and exiting the residence. Law enforcement determined that the individual entering and exiting the residence was BERNABE based on the resemblance of the individual at the BERNABE Residence to an immigration photograph of BERNABE provided by Homeland Security Investigations.

In addition, ping location data for Target Phone 2 throughout the periods of interception described below showed Target Phone 2 located in the vicinity of the BERNABE Residence during late night and early morning hours. Further, as described in greater detail below, on or about July 9, 2021, law enforcement observed BERNABE at the BERNABE Residence and

MALDONADO located on the 4400 block of South California Avenue, Chicago, Illinois

(the "MALDONADO Residence"[2]). Together, the BERNABE family and other

---

at the time of the surveillance, ping location data for Target Phone 2 placed BERNABE in the vicinity of the BERNABE Residence.

Law enforcement identified BERNABE as the user of Target Phone 2 as follows: on or about November 22, 2020, the CI had an audio recorded meeting with BERNABE at the MALDONADO Residence and identified BERNABE as the main participant at the meeting. Law enforcement officers listened to the audio recording of the November 22, 2020 meeting and the voice of the user of Bernabe Phone 1 and compared it to the voice of the user of Target Phone 2 and determined that the voice belonged to the same person (BERNABE). Law enforcement also listened to the voice of the user of (XXX) XXX-7264 ("Bernabe Phone 1") and compared it to the audio recording of the November 22, 2020 meeting, as well as the voice of the user of Target Phone 2 and determined that the voices belonged to the same person (BERNABE).

[2] Law enforcement identified the residence on the 4400 block of South California Avenue, Chicago, Illinois as MALDONADO's and VALENCIA's residence as follows: law enforcement officials conducted surveillance of MALDONADO and VALENCIA and the residence on numerous occasions. On or about November 20, 2020, and October 13 and 15, 2021, law enforcement officers observed MALDONADO entering and exiting the residence. Further, during surveillance, including on or about October 13, 2021, law enforcement officers observed VALENCIA entering and exiting the residence. Law enforcement determined that the individuals entering and exiting the residence were MALDONADO and VALENCIA based on the resemblance of the individuals at the residence to immigration photographs of MALDONADO and VALENCIA from Homeland Security Investigations.

In addition, geo-location data for Target Phone 4, which, as discussed below, was used by MALDONADO, and for Valencia Phone 1, which, as discussed below, was used by VALENCIA, reflected that the phones were located in the vicinity of this address during late night and early morning hours.

Law enforcement officials identified MALDONADO as the user of Maldonado Phone 1, as well as Maldonado Phone 2 (XXX-XXX-8588), Maldonado Phone 3 (XXX-XXX-5733), Maldonado Phone 4 (XXX-XXX-6044) and Target Phone 4, (collectively, the "Maldonado Phones") in part, based on on the following: (1) according to subscriber information for Maldonado Phones 2 and 3, the phones were registered to "JOSE ALFREDO" and "JOSE ALFREDO MALDONADO," respectively; (2) Maldonado Phone 4 is subscribed to the MALDONADO Residence; (3) as described in greater detail below, the CI had a recorded meeting with MALDONADO on or about November 22, 2020 at the MALDONADO Residence, during which meeting law enforcement officials conducting surveillance observed an individual later identified as MALDONADO at the Maldonado Residence. Law enforcement officers compared the voice of the user of the Maldonado Phones with the voice

individuals working with the BERNABE family, have conspired to obtain wholesale quantities of cocaine from drug suppliers and distribute the cocaine to narcotics customers located in the Chicago area and elsewhere.

8.     During the course of the conspiracy, SOTO-GARCIA was a supplier of wholesale quantities of cocaine to the BERNABE DTO. As discussed in further detail below, on or about November 22, 2020, a confidential source working at the direction of law enforcement purchased approximately 1 kilogram of cocaine from BERNABE and MALDONADO. Before the drug distribution, BERNABE and MALDONADO exchanged multiple phone calls about the sale.  On or about November 22, 2020, SOTO-GARCIA met with BERNABE and MALDONADO at the MALDONADO Residence in order to distribute the cocaine to a confidential informant.

---

of MALDONADO on the audio recording of the November 22, 2020 meeting and determined that the voice belonged to the same person (MALDONADO).

Law enforcement identified VALENCIA as the user of (XXX) XXX-6491 ("Valencia Phone 1"), as well as (XXX) XXX- 4176 ("Valencia Phone 2") and (XXX) XXX-8619 ("Valencia Phone 3") as follows: during the course of the investigation, on or about February 26, 2020, the CI had an audio recorded meeting with an individual who identified herself as "Claudia." In addition, law enforcement officers conducting surveillance that same day observed the CI meet with a female individual later identified as VALENCIA based on a comparison to an immigration photograph of VALENCIA from Homeland Security Investigations. Law enforcement officers listened to the voice of the user of Valencia Phone 1, Valencia Phone 2, and Valencia Phone 3 and compared it to the voice of VALENCIA on the audio recording of the February 26, 2020 meeting and determined that the voice belonged to the same person (VALENCIA). Further, during a call on or about July 31, 2021, at approximately 12:59 p.m. (TP2 Session 998), BERNABE, using Target Phone 2, had a telephone call with Individual D and VALENCIA, using Valencia Phone 3. During the phone call, described below, BERNABE asked Individual D to put "Claudia" on the phone. Individual D stated "Claudia, come over here. Your dad is calling you," and a female began using the phone. As explained below, law enforcement reviewed immigration records in which VALENCIA listed her father as BERNABE.

7

9.     CAMPUZANO was a narcotics customer of the Bernabe DTO. As discussed in further detail below, on or about July 9, 2021, BERNABE and Individual A purchased a wholesale quantity of cocaine from a narcotics supplier. BERNABE then had several phone calls with CAMPUZANO regarding the distribution of kilogram quantities of cocaine. After BERNABE distributed the cocaine to CAMPUZANO, law enforcement conducted a traffic stop of CAMPUZANO and seized approximately 3 kilograms of cocaine.

### B.     Summary of Evidence Obtained During the Investigation

10.     According to an FBI confidential informant (the "CI")[3]:

a.     In the summer of 2019, the CI received information from a contact in Mexico that there was a family based in Chicago moving a significant quantity of cocaine. That contact informed the CI that the patriarch of the family, later identified as BERNABE, was a respected man because of his time working for various Mexican drug cartels before leaving Mexico and relocating to Chicago.

b.     An individual whom the CI knew as "Guero" or "Wero," later identified as MALDONADO, was a wholesale distributer of cocaine who primarily

---

[3] The CI has been cooperating with law enforcement since approximately December 2016 in exchange for monetary compensation. To date, the CI has been paid over approximately $44,683.27 in connection with this case and another case. The CI has multiple arrests and no felony convictions. The CI has provided information in this investigation, which I believe to be useful and reliable. Some of the information provided by the CI has been corroborated by independently obtained evidence, including recorded calls, surveillance, the seizure of 1 kilogram of cocaine, and a review of law enforcement databases.

worked with his father (BERNABE) and his sister (later identified as VALENCIA).[4] For at least the last year, the CI has had contact with members of the BERNABE DTO about cocaine trafficking.

11.     The investigation also included court-authorized interceptions of communications over various cellular telephones used by the following individuals[5]:

| Target Phone | Phone Number | User | Interception Period |
|---|---|---|---|
| Target Phone 1 | (XXX) XXX-4443 | MALDONADO | 5/14/2021-5/17/2021 |
| Target Phone 2 | (XXX) XXX-5941 | BERNABE | 6/23/2021-7/22/2021<br>7/28/2021-8/26/2021<br>9/9/2021-10/8/2021 |
| Target Phone 3 | (XXX) XXX-6357 | BERNABE | 6/23/2021-7/22/2021 |
| Target Phone 4 | (XXX) XXX-7526 | MALDONADO | 6/23/2021-7/22/2021 |
| Target Phone 5 | (XXX) XXX-3924 | BERNABE | 8/12/2021-8/20/2021 |

---

[4] According to immigration records maintained by Homeland Security Investigations, "Claudia Nataly Maldonado-Valencia" and "Jose Alfredo Maldonado-Valencia" each listed "Jorge Luis Maldonado-Bernabe" as their father. Further, on multiple occasions, (TP2 Sessions 212, 227, 407, and 742, among others), law enforcement officials intercepted calls involving BERNABE, using Target Phone 2, and JUAN CARLOS, using multiple phones, and identified based on law enforcement officials' familiarity with his voice, as discussed *infra*, where JUAN CARLOS referred to BERNABE as "dad" and BERNABE referred to JUAN CARLOS as "son."

[5] On or about May 14, 2021, Acting Chief Judge John J. Tharp, Jr. entered an order authorizing the initial interception of wire and electronic communications to and from Target Phone 1. On or about June 22, 2021, Chief Judge Rebecca Pallmeyer entered orders authorizing the initial interception of wire communications to and from Target Phones 2, 3, and 4. On or about July 28, 2021 and September 8, 2021, Chief Judge Rebecca Pallmeyer entered orders authorizing the renewed interception of wire communications to and from Target Phone 2. On or about August 12, 2021, Acting Chief Judge Manish S. Shah entered an order authorizing the initial interception of wire communications to and from Target Phone 5.

### III.    FACTS SUPPORTING PROBABLE CAUSE

#### A.    Narcotics Transactions Conducted by the BERNABE DTO

##### 1.    November 22, 2020 Controlled Purchase of 1,005.6 Grams of Cocaine from MALDONADO and BERNABE

12.    On or about November 8, 2020, MALDONADO, using Maldonado Phone 1, sent a consensually recorded text message to the CI, which contained a photograph of 10 different stacks of cash, some of which contained $100 bills. According to the CI, based on his familiarity with MALDONADO, this was a signal from MALDONADO that the BERNABE DTO had received a narcotics supply and was making money from distributing narcotics.

13.    On or about November 18, 2020, at approximately 12:39 p.m., the CI had a consensually recorded conversation via WhatsApp with BERNABE, using Target Phone 2.  During the conversation,[6] BERNABE stated, "I will take care of you [supply narcotics] when I am available. It will not be a problem, but that I may be

---

[6] Some of the lawfully intercepted conversations ("recorded conversations") have been summarized in this Affidavit.  The language that is quoted from the recorded conversations throughout this Affidavit is based on draft, not final, transcripts of the recorded conversations.  The times listed for the recorded conversations are approximate and, unless otherwise indicated, reflect the time in the North American Central Time Zone.  The summaries do not include all statements or topics covered during the course of the recorded conversations.    At various points in the Affidavit I have included in brackets my interpretation of words and phrases used in the recorded conversations.  My interpretations are based on information received from the contents and context of the recorded conversations, events that took place before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.   Some of the recorded conversations contained herein are in the Spanish language.  For these conversations, I have relied on draft – not final – English translations of conversations in Spanish done by law enforcement officials proficient in Spanish and/or interpreters contracted by the FBI.

tied up on some business in Indiana Thursday and Friday of that week [November 19 and 20, 2021]."

14.     Based on my training and experience and knowledge of the investigation, I believe that in the above exchange, BERNABE informed the CI that he would be able to supply the CI with cocaine after a trip to Indiana on behalf of the BERNABE DTO.

15.     On or about November 19, 2020, at approximately 4:45 p.m., the CI, using WhatsApp, had a consensually recorded conversation with BERNABE, using Target Phone 2.  During the conversation, the CI asked, "Old man [BERNABE], just to confirm that it's 43 [$43,000 for one kilogram of cocaine], right?"  BERNABE asked, "Excuse me?"  The CI continued, "Just to confirm." BERNABE interrupted, "No, it's Guero [MALDONADO] who knows about that [the price per kilogram of narcotics], it's Guero [MALDONADO]. Let me call you from the other number, let me call you from the other number; let me call you from the other number."  The CI responded, "Call me right away."

16.     Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) the CI asked to confirm that the cost for a kilogram of cocaine would be $43,000; (b) BERNABE said that his son, MALDONADO, would know what the BERNABE DTO would charge for the kilogram of cocaine; and (c) BERNABE said that he would call from a different phone (as discussed below, Bernabe Phone 1).

11

17. On or about November 19, 2020, at approximately 4:48 p.m. (three minutes after the above call), the CI had a consensually recorded conversation with BERNABE, using Bernabe Phone 1. During the conversation:

a. The CI asked, "Old man [BERNABE]?" BERNABE replied "What's up? This is the number [Bernabe Phone 1] that I use for the [narcotics] transaction. Hey, regarding that stuff [the price of the kilogram of cocaine], I don't know; I will confirm tomorrow, and we can come to an agreement with Guero [MALDONADO] because you know that we'll work it out. Guero [MALDONADO] told me to talk with you directly because Guero [MALDONADO] has no patience to work [sell narcotics]. That dude doesn't do a damn thing. So then, we'll coordinate one way or another but I won't confirm until I have them [the narcotics] ready. What do you think?" CI replied, "Because, it's just that I only have the 43 [$43,000]." BERNABE replied, "You don't worry. You know that if you're short [the total cost of the kilogram of cocaine] I will help you out, but we'll talk about that tomorrow." CI replied, "All right then, thank you very much. But you'll take care of me [provide the kilogram of cocaine] tomorrow, right?" BERNABE replied, "Man, man, if I'm ready tomorrow I will call you first, you know that I will."

18. Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) BERNABE told the CI that, as opposed to Target Phone 2, the phone on which he had previously spoken to the CI, he used Bernabe Phone 1 to negotiate narcotics sales; (b) BERNABE said that he did not know what the price would be for the kilogram of cocaine, but that BERNABE

12

would confirm the price the following day after speaking with MALDONADO; (c) the CI said that he only had $43,000 to buy the kilogram of cocaine; and (d) BERNABE said that if the kilogram cost more than $43,000, BERNABE would cover the difference or reduce the cost.

19.    On or about November 20, 2020, at approximately 6:04 p.m., the CI made a consensually recorded WhatsApp phone call to BERNABE, using Bernabe Phone 1.  During the conversation:

a.    The CI asked, "How do you feel, for tomorrow [will BERNABE conduct the narcotics transaction on November 21, 2020]?"  BERNABE replied, "Man, I'd like to do it tomorrow; you know that, right? I would like for us to be ready tomorrow but if they [the narcotics suppliers] don't [provide additional kilograms of cocaine to sell], if they don't call me . . . Son of a bitch, we'll just have to wait." The CI stated, "You let me know by Sunday or Monday [November 22 or 23, 2020] and then." BERNABE replied, "Okay."

20.    Based on my training and experience and knowledge of the investigation, I believe that in the above exchange the CI asked about whether BERNABE would be ready for the cocaine sale on November 21, 2020 and BERNABE responded that he wanted to go forward, but that he had to wait to hear from his cocaine suppliers.

21.    On or about November 21, 2020, at approximately 4:08 p.m., the CI made a consensually recorded WhatsApp phone call to MALDONADO, using Target Phone 4.  During the conversation:

13

a.      MALDONADO asked, "Did your brother eat [get a supply of narcotics] already?"  The CI replied, "No, no he's [fictitious narcotics buyer] just on his way over to me.  We're going to meet right now in about five-ten minutes. Well, we can eat [conduct the narcotics transaction] in the morning but if it's 100% for sure man so I can tell my brother [fictitious narcotics buyer] right now."  MALDONADO said, "I don't have anything [narcotics], otherwise I would have called you. Well, you know my dad [BERNABE] said in a few weeks, if not I wouldn't have called you. The [U/I] will get here in about two hours [to supply narcotics] in order to eat [conduct the narcotics transaction] early tomorrow."  The CI stated, "Early tomorrow?" MALDONADO replied, "Yeah, man. I'll confirm as soon as it [the cocaine] arrives, I'll send you a photo. But it is for sure, man. Yeah, because this one is through my side [MALDONADO's supplier] not my dad's [BERNABE's supplier]."

b.      The CI asked, "The same number [cost of narcotics] right?" MALDONADO stated, "Yeah, man, well I had given you that number [$43,000] but I can't help you with anything else so that you can make something. Just give me what you said you were going to give me, that's all." The CI stated, "I'm only going to give you the 43 [$43,000] even, man. All right then man, bye." MALDONADO stated, "I'll confirm as soon as it arrives.  Confirm it with your brother [narcotics buyer] that we'll eat [conduct the transaction] early tomorrow."

22.      Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) MALDONADO asked if the CI's (fictitious) narcotics purchaser had obtained narcotics and the CI said that he

14

had not and that they were meeting to discuss narcotics transactions; (b) MALDONADO said that he had not received a shipment of narcotics yet, but that he was meeting later that day in order to obtain narcotics so MALDONADO could distribute them on November 22, 2020; (c) MALDONADO said that he would send the CI a photograph of the narcotics once they arrived and assured the CI that the deal would take place because the narcotics supplier (as discussed below, SOTO-GARCIA) was his personal supplier and not another used by BERNABE; and (d) MALDONADO and the CI confirmed the price of $43,000 for a kilogram of cocaine.

23.     On or about November 22, 2020, at approximately 12:38 p.m., the CI sent MALDONADO a consensually recorded text message over WhatsApp stating, "I am on the way."  MALDONADO, using Target Phone 4, sent the CI a text message via WhatsApp with the address of the MALDONADO Residence.

24.     Based on my training and experience and knowledge of the investigation including prior and subsequent intercepted calls, information from the CI, and the subsequent seizure of a wholesale quantity of cocaine following the above-described communications, I believe that MALDONADO sent the address for the MALDONADO Residence to the CI to tell the CI to arrive at the MALDONADO Residence for the narcotics transaction the CI had discussed with BERNABE and MALDONADO.

25.     In anticipation of the transaction, law enforcement officials met with the CI at a predetermined location and searched the CI and the CI's vehicle for contraband with negative results. The CI was equipped with an audio recording

15

device, which was turned on at approximately 1:53 p.m. and ran until it was turned off after the transaction was completed at approximately 5:27 p.m., and $43,000 in government funds to purchase the narcotics from BERNABE and MALDONADO. The CI then traveled in the CI's vehicle to the MALDONADO Residence under constant surveillance.

26.     Law enforcement officials conducting surveillance at the MALDONADO Residence observed the following:

         a.      At approximately 2:27 p.m., a black Toyota Camry bearing license plate BQ58206 ("Maldonado Vehicle 1")[7] exited the alley behind the MALDONADO Residence with MALDONADO driving and an unknown individual seated in the passenger seat.

         b.      At approximately 2:30 p.m., the CI arrived at the MALDONADO Residence.

27.     The meeting lasted approximately two hours.  Based on a review of the audio recording of the meeting and information provided by the CI:

         a.      At approximately 3:55 p.m., BERNABE, using Bernabe Phone 1, used the speakerphone function to call MALDONADO, using Target Phone 4.[8]

---

[7] According to Illinois Secretary of State records, the black Toyota Camry is registered to Juan Carlos Maldonado at an address on the 5800 block of South Francisco Avenue, in Chicago, Illinois.

[8] According to historical call records provided by T-Mobile for Target Phone 4, at approximately 3:55 p.m., the user of Target Phone 4 (MALDONADO) received a call from the user of Bernabe Phone 1 (BERNABE) that lasted approximately one minute and 29 seconds. Based on the previous identification of BERNABE as the user of Bernabe Phone 1, I believe

BERNABE stated, "put it [the narcotics] in the duffle bag," and "pay [for the cocaine] there . . . the four forty-one and a half [$41,500 for a kilogram] . . . and take back the rest [of the narcotics] in the duffle bag." MALDONADO replied, "Okay."

b. At approximately 4:05 p.m., BERNABE, using Bernabe Phone 1, received a call from MALDONADO, using Target Phone 4,[9] which call BERNABE placed on speakerphone. BERNABE stated, "Give him 46 [$46,000], I told you to give him [$]500 so he can bring us [courier over] one [kilogram of cocaine] over here [MALDONADO Residence]." BERNABE said, "Send that [the narcotics] to me right away. Was everything okay with the money? It better be well counted."

c. BERNABE and the CI then had the following exchange:

i. BERNABE stated, "There hasn't been any stuff [narcotics]." BERNABE noted, "They're [narcotics traffickers] only letting a bit come across [the border into the United States]" and that "they [narcotics traffickers] only brought five [five kilograms of cocaine]." BERNABE added, "They can't get any more across [the border into the United States] and what is getting across is only in small hidden compartments [concealed within vehicles]." The CI asked, "Is it [the narcotics] from down below [Mexico]?" BERNABE affirmed, "It is from down below [Mexico]" and informed the CI that, "it's going for [$]21,000 in Mexico."

---

that the above-described audio recording captured BERNABE's side of the conversation in a conversation with MALDONADO.

[9] According to historical call records provided by T-Mobile for Target Phone 4, at approximately 4:05 p.m., the user of Target Phone 4 (MALDONADO) made an outgoing call to the user of Bernabe Phone 1 (BERNABE) that lasted approximately 25 seconds.

ii.     The CI stated, "They're going [selling for] over [a profit of] [$]20,000." BERNABE continued, "They'd rather take the risk [of law enforcement detection] and make [$]100,000 per trip. They're probably just going back and forth [between Mexico and the United States] and would imagine they have two cars, one going down [with money] and one coming up [with narcotics]." BERNABE stated, "They [law enforcement] took $200,000 from her [VALENCIA] and how she picked up a tail [detected by law enforcement] at the last house." The CI asked, "What did the bosses say?" BERNABE responded, "They were her [VALENCIA's] bosses and they had already called me. I told her [VALENCIA] not to do those kind of favors [act as a money courier for associates not well known]."

28.     Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) BERNABE discussed the current difficulty with moving large amounts of narcotics across the US/Mexican border and that his current supplier recently moved only five kilograms across the border in a hidden compartment; (b) BERNABE indicated that the narcotics traffickers that VALENCIA agreed to pick up money for had already contacted BERNABE to let him know they were not pleased with her losing $200,000 in narcotics proceeds; and (c) BERNABE advised his daughter VALENCIA not to accept jobs from individuals she or the BERNABE DTO were unfamiliar with going forward.

29.     At approximately 4:15 p.m., law enforcement officials observed MALDONADO return to the MALDONADO Residence.

30.     At approximately 5:00 p.m., law enforcement officials observed SOTO-GARCIA[10] arrive at and enter the MALDONADO Residence. Based on a review of the audio recording, during this portion of the meeting:

a.      BERNABE stated, "Leave it [the narcotics] there. Here it is [the money]. I already counted it, it's been well-counted. I'm only going to take what's mine here [his share of the proceeds]." SOTO-GARCIA[11] stated, "I have this one [kilogram of narcotics] already open [for the CI to inspect]." The CI asked, "Does it have the brand [cartel specific logo imprinted on the kilogram]?" SOTO-GARCIA replied, "They are the same only that I opened this one [kilogram] before heading over here to check the quality [of the cocaine]." The CI stated, "They [his customers]

---

[10] Law enforcement identified SOTO-GARCIA as follows: the CI reviewed a Homeland Security Investigations photograph of "Juventino Soto Garcia" and identified him as the individual who delivered the kilogram of cocaine, described below, to the MALDONADO Residence on or about November 22, 2020. Additionally, between on or about November 1, 2020 and on or about November 30, 2020, according to historical call records provided by T-Mobile for Target Phone 2, Target Phone 4, and Bernabe Phone 1, those three phones were in contact with telephone number (XXX) XXX-4207 ("Soto-Garcia Phone 1"), which was subscribed to an individual named "Juventino Garcia."

Further, on or about October 5, 2021, law enforcement conducted a traffic stop of a white Toyota Camry, bearing Illinois license plate CQ61549, which was registered to "Claudia Maldonado" and residence located on the 4400 block of South Wood Street, Chicago, Illinois. During the traffic stop, the driver provided law enforcement with a California Secretary of State identification card bearing SOTO-GARCIA's photograph and the name, "Juventino Soto-Garcia." Law enforcement determined that the individual encountered on or October 5, 2021 and the individual observed entering the MALDONADO Residence on or about November 22, 2020 was the same person (SOTO-GARCIA).

[11] Law enforcement identified SOTO-GARCIA as the speaker based on the following: following the stop of SOTO-GARCIA on or about October 5, 2021, the law enforcement officer who conducted the stop and spoke with the driver (SOTO-GARCIA) listened to the audio recording of the November 22, 2020 meeting and recognized one of the voices on the recording as the same as the person he encountered during the traffic stop.

mostly want it for rock [crack cocaine]." SOTO-GARCIA replied, "It's [the narcotics] giving back 99.9 [percent purity in quality] and the stuff [narcotics] are like cookies [referring to the addictive quality of the narcotics]." BERNABE told MALDONADO, "Get a Ziploc bag [for the CI] so that he can wrap it up well so that it doesn't smell at all [so that the cocaine is not easily detected by law enforcement]."

31.    Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) BERNABE instructed SOTO-GARCIA to take out the cocaine, and SOTO-GARCIA affirmed that he had a kilogram of cocaine ready for the CI to inspect; (b) the CI asked about whether the kilogram had any stamping on it, and SOTO-GARCIA indicated that he was not sure, but that the quality was good; and (c) BERNABE told MALDONADO to help the CI wrap the cocaine well before he/she left so that that the cocaine was not easily detected by law enforcement.

32.    According to the CI, SOTO-GARCIA brought the narcotics to the MALDONADO Residence and presented the narcotics for inspection. The CI paid $43,000 in exchange for the narcotics.

33.    Law enforcement officials conducting surveillance observed the CI leave the MALDONADO Residence and followed the CI to a predetermined location. At the meeting, law enforcement recovered the brick-shaped object, which was wrapped in grey tape. Law enforcement officials searched the CI for other contraband with negative results.

20

34. Following the seizure, the suspect cocaine provided to the CI was submitted to the Drug Enforcement Administration ("DEA") North Central Laboratory for testing. The DEA North Central Laboratory confirmed that the substance tested positive for cocaine and weighed approximately 1,005.6 grams.

### 2. Between June 24 and June 26, 2021 MALDONADO and VALENCIA Attempt to Possess Approximately 55 Grams of Cocaine

35. According to CBP, on or about June 24, 2021, CBP officials in Memphis, Tennessee selected a parcel with tracking number 774090686620 (the "Subject Parcel") for an extensive exam and conducted a warrantless search pursuant to the CBP's border search authority.

36. According to the FedEx label for the Subject Parcel, the Subject Parcel originated in Mexico and was addressed to "Celeste Lopez" at the MALDONADO Residence. The packaging information listed the contents of the Subject Parcel as "food items." An x-ray inspection yielded anomalies with the items in the package. CBP officials opened the Subject Parcel and found 4 small bundles wrapped in two guava rolls, which field-tested positive for the presence of cocaine.

37. On or about June 25, 2021, at approximately 10:40 a.m. (TP4 Session 188), MALDONADO, using Target Phone 4, called VALENCIA, using Valencia Phone 1. During this conversation, MALDONADO said, "Start heading to the house." VALENCIA asked, "Did they [FedEx] give it [the package] to you?" MALDONADO replied, "Go fucking home [MALDONADO Residence]. What don't you understand? Just start heading to the house [MALDONADO Residence]."

21

38. Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) VALENCIA asked MALDONADO about the status of the FedEx package which contained cocaine; and (b) MALDONADO instructed her to go home to wait for the package to arrive.

39. At approximately 10:42 a.m. (TP4 Session 189), MALDONADO, using Target Phone 4, called VALENCIA, using Valencia Phone 1. During this conversation:

    a. MALDONADO stated, "The guy has it [the FedEx delivery driver], but it's a mess in the back of the truck [FedEx delivery truck] . . . he couldn't find it [the Subject Parcel]" and that "the 5:00 p.m. [FedEx] delivery guy might deliver it." VALENCIA said, "I am on my way to pick up mom." MALDONADO added, "They checked with the scanner and it showed the box on the truck, but the guy [FedEx delivery driver] couldn't locate it." VALENCIA responded, "Then at 5 [5:00 p.m.], I will stop it."

40. Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) MALDONADO told VALENCIA that according to FedEx, the package containing the cocaine was on a FedEx truck, but the delivery driver was not able to find the package in the truck; and (b) VALENCIA responded that she would stop the truck to obtain the package containing the cocaine.

41. At approximately 7:57 p.m. (TP4 Session 218), MALDONADO, using Target Phone 4, called FedEx to inquire about the Subject Parcel. During this conversation:

a. MALDONADO stated, "I am waiting for a package [the Subject Parcel] and received an email about a delay . . . and that it was already in Memphis." The FedEx representative asked, "What is the tracking number?" MALDONADO replied, "774090686620 [the Subject Parcel]." The FedEx representative asked, "First name and last name?" MALDONADO responded, "Lopez." The FedEx representative said, "It is still in Customs" and that "they need documentation from the FDA."

42. On or about June 26, 2021, at approximately 9:11 a.m. (TP4 Session 234), MALDONADO, using Target Phone 4, called FedEx. During this conversation:

a. MALDONADO stated, "I am checking on package #774090686620 [the Subject Parcel]." The FedEx representative replied, "There's a package from Mexico to the United States for Celeste Lopez . . . the package is in Memphis, Tennessee and is being held by the Food and Drug Administration. It's being verified to ensure that this product can enter the US . . . ." MALDONADO asked, "Did it have anything to do with some emails regarding RCTP [Real-time Transport Control Protocol]?" The FedEx representative replied, " . . . all I know is that the package is being detained by Customs" and that they are "awaiting their confirmation that the package may enter the US."

43.    On or about June 29, 2021, CBP relinquished custody of the Subject Parcel, along with its contents and shipping label, to the FBI due to the ongoing investigation into the BERNABE DTO.

44.    On or about July 23, 2021, the suspect cocaine recovered from the Subject Parcel was submitted to the DEA North Central Laboratory for testing. The DEA North Central Laboratory confirmed that the substance tested positive for the presence of cocaine and weighed approximately 55 grams.

### 3.    On July 8, 2021 BERNABE and Individual A Arranged to Obtain Wholesale Quantities of Cocaine

45.    On or about July 8, 2021, at approximately 7:07 p.m. (TP2 Session 539), BERNABE, using Target Phone 2, had a telephone call with Individual A, using telephone number (XXX) XXX-0649 ("Individual A Phone 2").[12] During the call:

---

[12] Investigators determined that Individual A is the user of Individual A Phone 2 as follows: In late December 2019, Individual A provided telephone number (XXX) XXX-1021 ("Individual A Phone 1") when purchasing a car in Indiana. The address listed with the car dealership and the phone's service provider was an address on the 17000 block of Behner Road in New Buffalo, Michigan, a residence at which Individual A has been surveilled and is believed to reside. In addition, law enforcement in another district has secured multiple search warrants for prospective location data for Individual A Phone 1. Law enforcement has conducted physical surveillance of Individual A on numerous occasions and observed that his movement mirrors the prospective location data received from the service provider. Law enforcement confirmed that Individual A is the individual they have observed using Individual A Phone 1 and 2 while conducting surveillance by comparing the individual using Individual A Phone 1 and 2 with a California driver's license photograph of Individual A.

On or about July 7, 2021 at approximately 11:45 a.m. (TP2 Session 459), BERNABE, using Target Phone 2, received a call from Individual A Phone 2. The caller advised BERNABE: "I said the other one [previous phone number] continues to work, the number. This is the one [phone number] to work with." A voice identification of the user of Individual A Phone 2 confirmed that Individual A was the user of both Individual A Phone 1 and Individual A Phone 2.

a.     Individual A said, "They [potential narcotics supplier] already called me. They will go to where you want tomorrow, so I can go over to you [the BERNABE Residence] or over here with your son [MALDONADO or JUAN CARLOS]. Where should we meet?" BERNABE replied, "Over here [the BERNABE Residence] is better with me."

b.     BERNABE asked, "But how many does he [narcotics supplier] have [kilograms of cocaine]?" Individual A replied, "Five [kilograms of cocaine]." BERNABE asked, "But how many [kilograms of cocaine] are you taking [purchasing]?" Individual A stated, "Two [kilograms of cocaine]." BERNABE responded, "Two. But first, I need to see them [the narcotics] so I can get people [buyers] to come with the money." Individual A replied, "Oh, well he's [narcotics supplier] telling me these are the last few [kilograms of narcotics] that remain." Individual A continued, "Alright then, then I will put the address somewhere around where you live and I will pick them [the supplier] up and we'll go together to where you are [the BERNABE Residence]. It's going to be around 11 [11:00 a.m. the next morning] with you."

46.     Based on my training and experience and knowledge of the investigation, including, as discussed below, surveillance of a meeting between BERNABE, Individual A, and Individual B, and the seizure of approximately $307,880 in cash from Individual B's vehicle after the meeting, I believe that in the above exchange: (a) Individual A told BERNABE that he was in contact with his narcotics supplier and that he would meet with the supplier to go to the BERNABE

Residence on July 9, 2021; (b) Individual A told BERNABE that the supplier was down to his last few kilograms of cocaine and that he (Individual A) wanted to purchase two kilograms of cocaine; and (c) BERNABE told Individual A that he wanted to view the cocaine first to ensure its quality before arranging for a buyer for the kilograms of cocaine that he intended to purchase.

### 4. On July 9, 2021 BERNABE and Individual A Meet with Individual B to Obtain Wholesale Quantities of Cocaine in Exchange for Bulk Cash

47. On or about July 9, 2021, at approximately 10:13 a.m. (TP2 Session 547), BERNABE, using Target Phone 2, called Individual A, using Individual A Phone 2. During the conversation, BERNABE asked, "Should I leave the door open for you? I'm going to the store. In case you arrive first, go on in. I'm going to the little store." Individual A replied, "Sounds good."

48. Based on my training and experience and knowledge of the investigation, I believe that in the above exchange, BERNABE told Individual A that he would leave the door to the BERNABE Residence unlocked in anticipation of the meeting between BERNABE and Individual A in order for BERNABE to receive kilograms of cocaine.

49. Beginning at approximately 10:27 a.m., law enforcement officers conducting surveillance observed the following:

a.　　At approximately 10:27 a.m., a silver Toyota Camry, bearing Indiana license plate BQQ656 ("Individual A Vehicle 1"),[13] arrived at the BERNABE Residence and parked in the driveway.  Individual A exited the front driver's door of Individual A Vehicle 1 and walked inside the BERNABE Residence.

b.　　At approximately 10:30 a.m., BERNABE arrived at the BERNABE Residence in Maldonado Vehicle 1 and entered the residence.

c.　　At approximately 11:00 a.m., Individual A exited the BERNABE Residence and drove away in Individual A Vehicle 1.

d.　　At approximately 11:04 a.m., BERNABE exited the BERNABE Residence and walked into the garage.

e.　　At approximately 11:07 a.m., Individual A arrived at a gas station located on the 8200 block of South Pulaski, Chicago, Illinois, and began talking on a cellular phone.

f.　　At approximately 11:15 a.m., a black Lexus sedan, bearing license plate CQ52731 ("Individual B Vehicle 1"),[14] pulled up alongside Individual A Vehicle 1 at the intersection of Pulaski and 83rd Street and followed Individual A Vehicle 1, in tandem, westbound on 83rd Street.

---

[13] According to Indiana Secretary of State records, Individual A Vehicle 1 is registered to an individual at a residence on the 6000 block of West 370 N., LaPorte, Indiana.

[14] According to Illinois Secretary of State records, the vehicle is registered to an individual at a location on the 2700 block of South Tripp Avenue in Chicago, Illinois.

g.      At approximately 11:17 a.m., Individual A, who was driving Individual A Vehicle 1, and Individual B, who was driving Individual B Vehicle 1, arrived at the BERNABE Residence. Individual B Vehicle 1 pulled into the garage and Individual B exited Individual B Vehicle 1 with a black bag slung over his shoulder. Individual A parked on the street adjacent to the BERNABE Residence and exited Individual A Vehicle 1.[15] Individual A walked into the garage of the BERNABE Residence.

h.      At approximately 11:22 a.m., Individual A exited the garage empty-handed and entered Individual A Vehicle 1. Individual A pumped the brakes from the driver's seat and appeared to make a pulling motion, which appeared to law enforcement to be a movement consistent with an attempt to access a trap[16] compartment inside the vehicle.

i.      At approximately 11:23 a.m., Individual A exited Individual A Vehicle 1 carrying a small black plastic shopping bag that appeared to be partially filled and returned to the garage.

j.      At approximately 11:26 a.m., Individual A exited the garage carrying what appeared to be the same black plastic shopping bag that appeared to contain a larger object than the object it contained when Individual A first obtained

---

[15] In a prior affidavit in this investigation, the affidavit indicated that Individual A pulled his vehicle behind Individual B Vehicle 1. The description above more accurately describes where Individual A parked Individual A Vehicle 1.

[16] Based on my training and experience, narcotics traffickers install concealed compartments in their vehicles to hide illicit items such as narcotics and firearms to avoid detection when stopped by law enforcement personnel.

the black plastic bag from the Individual A Vehicle 1. Individual A then reentered Individual A Vehicle 1.

k.      At approximately 11:28 a.m., Individual A walked back into the garage carrying a dark colored backpack that Individual A retrieved from of Individual A Vehicle 1.

l.      At approximately 11:29 a.m., Individual B exited the garage, threw a dark colored backpack, consistent in appearance to the one Individual A was seen with, into the trunk of Individual B Vehicle 1, and departed the area.

m.      At approximately 11:32 a.m., Individual A exited the garage, entered Individual A Vehicle 1, and departed the area.

50.     At approximately 11:38 a.m., law enforcement conducted a traffic stop[17] of Individual B, who was driving Individual B Vehicle 1, at the intersection of Cicero Avenue and 72nd Street in Oak Lawn, Illinois.  Individual B gave oral consent to search Individual B Vehicle 1, during which search agents recovered two backpacks from the trunk.  One of the backpacks was consistent with the backpack Individual B appeared to have obtained from Individual A. Together, the backpacks contained approximately $307,880 in cash.

51.     Based on my training, experience, and familiarity with this case – including prior and subsequent intercepted calls, and the July 9, 2021 seizure of approximately $307,880 in cash from Individual B after meeting with BERNABE and

---

[17] Law enforcement officials conducted a traffic stop based on observations that Individual B Vehicle 1 had engaged in illegal lane usage.

Individual A – I believe that, during the meeting between BERNABE, Individual A, and Individual B, Individual B received narcotics proceeds, which were recovered from the backpack that Individual A provided to Individual B.

> **5.    On July 9, 2021 BERNABE Distributes 3,003.4 Grams of Cocaine to CAMPUZANO**

52.    On or about July 9, 2021, at approximately 3:02 p.m. (TP2 Session 560), BERNABE, using Target Phone 2, called CAMPUZANO, using telephone number (XXX) XXX-9738 ("Campuzano Phone 1").[18] During the conversation:

a.    CAMPUZANO asked, "What was I going to ask you and the guys' men that you had there to work [kilograms of cocaine] at the restaurant how old [how much do they cost] are they and are they [the kilograms of cocaine] still there with you?" BERNABE responded, "Well, they're [the kilograms of cocaine] still, I still have them [the kilograms of cocaine] there." CAMPUZANO asked, "And how old are they [the kilograms of cocaine]?" BERNABE stated, "They're [the kilograms of cocaine] . . . the same. And you have more, do you have more [money for additional kilograms of

---

[18] Law enforcement identified CAMPUZANO as the user of Campuzano Phone 1 as follows: as described in greater detail below, on or about July 9, 2021, following the distribution of narcotics from BERNABE to CAMPUZANO, law enforcement conducted a stop of a white Honda, bearing Illinois license plate CQ54302, which was registered to a male individual at an apartment on the 4300 block of West Cornelia Avenue in Chicago, Illinois ("Campuzano Vehicle 1"). During the stop, the driver provided law enforcement with a Mexican Consular identification card bearing CAMPUZANO's photograph, the name "Antonio Campuzano Garcia," and the same address on the 4300 block of West Cornelia Avenue referenced above. Following the stop, the law enforcement officer that conducted the stop of Campuzano Vehicle 1 listened to intercepted calls with the user of Campuzano Phone 1 and compared the voice on the intercepted calls to the voice of CAMPUZANO and determined that the voice of CAMPUZANO matched the voice of the user of Campuzano Phone 1. Further, ping location data for Campuzano Phone 1 showed the phone to be located in the vicinity of the West Cornelia address referenced above during late night and early morning hours.

cocaine or kilograms of cocaine]?" CAMPUZANO stated, "No, no. I was asking you because the man over there [narcotics supplier] isn't answering I don't know what. It goes to voice mail and it goes to voice mail, that's why I was asking you if you have people there to work [kilograms of cocaine]." BERNABE stated, "Yes." CAMPUZANO asked, "And how old are they [how much do the kilograms of cocaine cost]?" BERNABE stated, "They're on, on 3-3 [$33,000 per kilogram]." CAMPUZANO stated, "Oh, 3-3?" BERNABE says "Yes but very fucking good, very very pretty [good quality]."

53.    Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) CAMPUZANO confirmed that BERNABE had kilograms of cocaine with him available to distribute to CAMPUZANO; and (b) BERNABE told CAMPUZANO that each kilogram of cocaine would cost $33,000 and that the cocaine was of high quality.

54.    At approximately 3:10 p.m. (TP2 Session 562), BERNABE, using Target Phone 2, received a call from CAMPUZANO, using Campuzano Phone 1. During the conversation:

        a.    CAMPUZANO stated, "I'm here fighting and fighting over the number [dollar amount] with, with the people [CAMPUZANO's cocaine purchasers]. Don't be a bad person, can you give it [a kilogram of cocaine] to me for thirty-two and a half [$32,500]? In order to at least earn a little something at least for me [earn a profit] because for real, these are persons [CAMPUZANO's cocaine purchasers] that keep coming back [returning customers]." BERNABE stated, "Look at thirty-two and

a half [$32,500] if, if, if we do the deal there, at the house [the BERNABE Residence]."
CAMPUZANO asked, "At your house?" BERNABE stated, "Yeah. Have them
[CAMPUZANO's cocaine purchasers] bring the money there and we'll do the deal
there [at the BERNABE Residence]."

55.    Based on my training and experience and knowledge of the
investigation, I believe that in the above exchange, CAMPUZANO asked BERNABE
to sell him each kilogram of cocaine for $32,500 so that CAMPUZANO could profit
when he re-sold the narcotics to his buyers and BERNABE agreed if the narcotics
distribution would occur at the BERNABE Residence.

56.    At approximately 3:33 p.m. (TP2 Session 570), BERNABE, using Target
Phone 2, received a call from CAMPUZANO, using Campuzano Phone 1. During the
call, BERNABE asked, "Are you ready with the ticket [money for the cocaine] there?"
CAMPUZANO replied, "Yes, I'm here with it [the narcotics proceeds]" and "tell him
[CAMPUZANO's narcotics customer] to come, to come just as soon as he can."
BERNABE responded, "One hour."

57.    Law enforcement officials conducting surveillance observed the
following:

a.    At approximately 4:33 p.m., BERNABE arrived at the BERNABE
Residence driving Maldonado Vehicle 1 and entered the residence.

b.    At approximately 7:10 p.m., Campuzano Vehicle 1 arrived at the
BERNABE Residence. CAMPUZANO exited the front driver's door of the vehicle and
entered the residence. As he exited Campuzano Vehicle 1 and entered the residence,

CAMPUZANO did not appear to be holding anything in his arms or have a backpack on.

      c.    At approximately 7:12 p.m., CAMPUZANO exited the residence carrying a red backpack and put the backpack in the trunk of Campuzano Vehicle 1.

58.    At approximately 7:52 p.m., based on the intercepted phone calls and surveillance discussed above, law enforcement officials conducted an investigatory stop of Campuzano Vehicle 1 at the intersection of Wilcox and Pulaski in Chicago. During the stop, CAMPUZANO gave oral consent to search his vehicle. Upon a consensual search of the vehicle, law enforcement recovered a red backpack from the trunk of the vehicle, which contained three individually wrapped packages that each resembled the size of a book and resembled packages of narcotics retrieved by law enforcement in previous investigations.

59.    Following the seizure, the suspect cocaine recovered from CAMPUZANO was submitted to the DEA North Central Laboratory for testing. The DEA North Central Laboratory confirmed that the substance tested positive for cocaine and weighed 3,003.4 grams.

### 6. On August 23, 2021 BERNABE and JUAN CARLOS Distributed 1,462.6 Grams of Cocaine to Individual C

60.    On or about August 23, 2021, at approximately 1:55 p.m., law enforcement officials initiated surveillance at the BERNABE Residence. Law enforcement officers observed the following:

33

a.     At approximately 2:03 p.m., SOTO-GARCIA exited the BERNABE Residence and entered the rear passenger seat of a dark-colored Chrysler Town and Country van, bearing Illinois registration 6595873.[19] The Town and Country van departed the residence; an Uber sticker was observed on the windshield of the vehicle.  Law enforcement followed the vehicle.

b.     At approximately 2:21 p.m., the Town and Country van arrived in the vicinity of a restaurant located on the 11900 block of South Cicero Avenue, Alsip, Illinois ("Restaurant A"), and SOTO-GARCIA exited the vehicle.

c.     At approximately 2:24 p.m., a dark gray Chevrolet Camaro, bearing Illinois registration CC93425,[20] arrived at Restaurant A and SOTO-GARCIA got into the passenger side of the Chevrolet Camaro.

d.     At approximately 2:26 p.m., the Chevrolet Camaro parked in a Home Depot parking lot, located at 12000 South Cicero Avenue, Alsip, Illinois.

e.     At approximately 2:33 p.m., SOTO-GARCIA exited the Chevrolet Camaro carrying a black backpack while talking on a cellular phone.  The driver of the Chevrolet Camaro remained in the car.

---

[19] According to Illinois Secretary of State records, the Town and Country van was registered to an individual on the 2600 block of South 58th Court, Cicero, Illinois.

[20] According to Illinois Secretary of State records, the Chevrolet Camaro van was registered to an individual at a residence on the 3200 block of 181 St., Lansing, Illinois.

f.      At approximately 2:45 p.m., a Silver Toyota Camry, Illinois registration CJ36762 (the "Lyft Vehicle"),[21] arrived at the Home Dept parking lot. SOTO-GARCIA, still carrying the black backpack, entered the rear passenger side of the vehicle, which then departed the area.

g.      At approximately 3:05 p.m., the Lyft Vehicle arrived at the BERNABE Residence and SOTO-GARCIA exited the vehicle. SOTO-GARCIA entered the residence carrying the same black backpack, while the Lyft departed the area.

h.      Between 3:05 p.m. and 5:21 p.m., no activity was observed at the BERNABE Residence.

i.      At approximately 5:21 p.m., Maldonado Vehicle 1 pulled into the driveway of the BERNABE Residence. BERNABE exited the front driver's door and an unknown female exited the front passenger's side door. Upon exiting the vehicle, both individuals entered the residence.

61.    Based on my training and experience and knowledge of this investigation, including the subsequent seizure of approximately 1.5 kilograms of cocaine from Maldonado Vehicle 1 on August 23, 2021, I believe that SOTO-GARCIA acquired approximately 1.5 kilograms of cocaine during his encounter in the Camaro,

---

[21] According to Illinois Secretary of State records, the Silver Toyota Camry was registered to an individual at a residence on the 3500 block of N Kilpatrick Ave, Chicago, Illinois. During surveillance, law enforcement officers observed a Lyft sticker on the back windshield of the vehicle.

as described above, and that he returned to the BERNABE Residence with the cocaine in order to distribute that cocaine to BERNABE.

62.     On or about August 23, 2021, at approximately 5:33 p.m. (TP2 Session 1755), BERNABE, using Target Phone 2, called JUAN CARLOS, using telephone number (XXX) XXX-4984 ("Juan Carlos Phone 1").[22]  During this conversation:

a.     BERNABE said, "The old man [narcotics customer] is outside, but tell him to wait a little so the old man [narcotics customer] can leave with me."  JUAN CARLOS agreed.  BERNABE asked, "Why doesn't he take the one and a half [1.5

---

[22] Law enforcement identified JUAN CARLOS as the user of Juan Carlos Phone 1 as follows: on or about July 8, 2021, at approximately 2:20 p.m. (TP2 Session 506), BERNABE, using Target Phone 2, received a call from the user of Juan Carlos Phone 1, during which BERNABE instructed the user of the phone to meet BERNABE at a restaurant located on the 4200 block of West 26th Street in Chicago. At approximately 2:35 p.m. (TP2 Session 512), BERNABE, using Target Phone 2, called the user of Juan Carlos Phone 1, during which the user of Juan Carlos Phone 1 said, "I am inside [the restaurant] and BERNABE replied "I am on my way." At approximately 2:57 p.m., law enforcement officers conducting surveillance observed that a white Volkswagen Jetta was parked in the restaurant parking lot located on the 4200 block of West 26th Street. Law enforcement also observed Maldonado Vehicle 1 parked in the parking lot. At approximately 3:29 p.m., law enforcement observed an individual exit the restaurant, enter the white Volkswagen Jetta, and depart from the area. Law enforcement confirmed that JUAN CARLOS was the individual they observed getting into the white Volkswagen Jetta by comparing the individual they observed with an Illinois driver's license photograph of  "Juan Carlos Maldonado" and determining that it was the same person.

Further, on or about July 8, 2021, at approximately 4:23 p.m. (Target Phone 2 Session 532), BERNABE, using Target Phone 2, had a telephone call with the user of Juan Carlos Phone 1. During that call, the user of Juan Carlos Phone 1 said, "I am outside in the parking lot and to tell him [a third party] that I am in my white Jetta."

In addition, during intercepted calls (TP2 Sessions 212, 227, 407, and 742) between BERNABE and the user of (XXX) XXX-7782 ("Juan Carlos Phone 3"), the user of Juan Carlos Phone 3 referred to BERNABE as "dad" and BERNABE referred to JUAN CARLOS as "son." Law enforcement officers compared the voice of the user of Juan Carlos Phone 1 with the voice of the users of (XXX) XXX-3510 ("Juan Carlos Phone 2") and Juan Carlos Phone 3, based on intercepted calls between those numbers and Target Phone 2, and determined that the voice belonged to the same person (JUAN CARLOS).

kilograms of cocaine]?" JUAN CARLOS responded, "Either way but to ask the old man [narcotics customer]." BERNABE said, "I think they should because the money shouldn't delay." JUAN CARLOS asked, "How much?" BERNABE replied, "We don't know, but the faster we move the better." JUAN CARLOS added, "Ask him first." BERNABE said, "He is with me and is hearing everything." JUAN CARLOS responded, "Then put it in [put the narcotics in the trap] if they want, but just let him [narcotics customer] know so he is in agreement." BERNABE replied, "They will put it [cocaine] in [the trap compartment of the vehicle] then."

63. Based on my training and experience and knowledge of the investigation, I believe that in the above exchange: (a) BERNABE and JUAN CARLOS discussed supplying a narcotics purchaser with 1.5 kilograms of cocaine; (b) BERNABE and JUAN CARLOS agreed that the faster they moved the cocaine, the better price they would receive from their supplier; and (c) JUAN CARLOS and BERNABE also discussed placing the 1.5 kilograms of cocaine in the trap compartment of the vehicle.

64. Law enforcement then observed the following:

a. At approximately 6:14 p.m., BERNABE exited the residence and entered Maldonado Vehicle 1, which was still parked in the driveway. As Maldonado Vehicle 1 pulled out of the driveway, law enforcement observed SOTO-GARCIA and Individual C, inside the vehicle.

b. At approximately 6:15 p.m., SOTO-GARCIA and BERNABE exited the vehicle and entered a grocery store located on the 8300 block of South

Pulaski Road, while Individual C, wearing a white hat, exited the vehicle and occupied the driver seat.

      c.    At approximately 6:20 p.m., BERNABE and SOTO-GARCIA reentered the vehicle and returned to the BERNABE Residence. BERNABE and SOTO-GARCIA entered the residence, while Individual C remained in Maldonado Vehicle 1.

      d.    At approximately 6:23 p.m., Individual C departed the BERNABE Residence in Maldonado Vehicle 1, as the sole occupant.

65. Based on my training and experience and knowledge of the investigation, including prior and subsequent intercepted calls and the subsequent seizure of approximately 1.5 kilograms of cocaine from Maldonado Vehicle 1 on August 23, 2021, I believe that, at some point on the afternoon of August 23, 2021, BERNABE placed approximately 1.5 kilograms of cocaine into a hidden compartment near the center console of Maldonado Vehicle 1.

66. After Individual C departed the BERNABE Residence, law enforcement initiated mobile surveillance and maintained constant surveillance of Maldonado Vehicle 1. From the time Maldonado Vehicle 1 departed the BERNABE Residence until approximately 8:27 p.m., Individual C drove the vehicle around Chicago and the surrounding suburbs, stopping once at a gas station in Summit, Illinois. At no time did any other individuals approach or enter Maldonado Vehicle 1.

67. At approximately 8:27 p.m., Illinois State Police performed a traffic stop of Maldonado Vehicle 1 while it was traveling westbound on Interstate 80.[23]

68. At approximately 8:35 p.m., law enforcement using a trained canine conducted an open-air sniff of Maldonado Vehicle 1, and the canine alerted positive to the presence of narcotics.

69. Law enforcement then conducted a search of the vehicle and noticed a gap on the center console. Upon popping the center console loose, law enforcement officials observed a black plastic bag with an additional clear plastic bag containing a white powdery substance. The substance field-tested positive for the presence of cocaine and weighed approximately 1,670 grams. Individual C was arrested by Illinois State Police.[24]

70. Following the seizure, the suspect cocaine recovered from Maldonado Vehicle 1 was submitted to the Illinois State Police ("ISP") Joliet Forensic Science Laboratory for testing. The ISP Laboratory confirmed that the substance tested positive for the presence of cocaine and weighed approximately 1,462.6 grams.

71. At approximately 8:42 p.m. (TP2 Session 1785), BERNABE, using Target Phone 2, received a call from JUAN CARLOS, using Juan Carlos Phone 1. During this conversation:

---

[23] The traffic stop was based on Maldonado Vehicle 1 following too closely behind another vehicle and the information provided by federal law enforcement to the state troopers that Maldonado Vehicle 1 had just been involved in narcotics-related activity.

[24] On or about August 23, 2021, Individual C was charged in the Circuit Court of Bureau County, Illinois with Possession of a Controlled Substance. Individual C's case remains pending.

39

a. JUAN CARLOS told BERNABE, "They [law enforcement] stopped the guy [narcotics customer]." BERNABE asked, "But is everything ok?" JUAN CARLOS replied, "Who knows? But hopefully yes." BERNABE said, "It's not a problem. Everything is fine." JUAN CARLOS asked, "But did you cover it [hide the narcotics] well?" BERNABE responded, "Yes. Everything is covered well."

72. Based on my training and experience and knowledge of the investigation, including prior intercepted calls, the surveillance of BERNABE, SOTO-GARCIA, and Individual C described above, and the seizure of approximately 1.6 kilograms of cocaine from Maldonado Vehicle 1 after the meeting between BERNABE, SOTO-GARCIA, and Individual C at the BERNABE Residence, I believe that in the above exchange: (a) JUAN CARLOS told BERNABE that law enforcement officials stopped their narcotics customer (Individual C); (b) BERNABE asked JUAN CARLOS if the drugs were seized; (c) JUAN CARLOS said that he did not know, but that he hoped that the drugs had not been seized and asked if BERNABE hid the cocaine in the trap compartment; and (d) BERNABE said that he had hid the cocaine in the trap compartment.

**B. BERNABE, MALDONADO, VALENCIA, and JUAN CARLOS Discussed the Operations of the BERNABE DTO**

73. Over additional intercepted communications, BERNABE, MALDONADO, VALENCIA, and JUAN CARLOS engaged in conversations with each other that furthered their narcotics trafficking activities. These communications included discussions regarding the pricing of narcotics, deliveries of narcotics to

40

customers, narcotics proceeds, including methods of payment for narcotics, and methods of concealing narcotics from law enforcement, including the use of a vehicle trap compartment and packaging to prevent the detection of narcotics. Examples of these communications are included below:

### 1. BERNABE and JUAN CARLOS Discussed Travelling Together to a Narcotics Transaction and the Price of Cocaine

74.     On or about June 29, 2021, at approximately 11:00 a.m. (TP2 Session 97), BERNABE, using Target Phone 2, received a call from JUAN CARLOS, using Juan Carlos Phone 1. During the conversation:

a.     BERNABE stated, "You see how the fucking black guy [narcotics customer] called me? He [narcotics customer] called me in the morning. I agreed to see him early in the restaurant." JUAN CARLOS asked, "Are you going there?" BERNABE responded, "I have to see him [narcotics customer] early tomorrow, son, so you can tell Luis to get ready to go with me." JUAN CARLOS replied, "No, I'll take you. No, I'll take you." JUAN CARLOS asked, "How much can we give it [narcotics] to Toyota [another customer] for, dad?" BERNABE answered, "No, this is way too high, son." JUAN CARLOS asked, "How much do you give it to him for?" BERNABE stated, "Another friend [source of supply of narcotics] is offering it to me at 31 and a half [$31,500 for one kilogram of cocaine]. Thirty-one and a half. It's really expensive. That's no good. That's too expensive."

b.     Based on my training, experience, and familiarity with this case – including information provided by the CI, the above-referenced July 9, 2021 and

41

August 23, 2021 seizures of wholesale quantities of cocaine, consensually recorded conversations, and prior and subsequent intercepted calls – I believe that, in the above exchange: (a) BERNABE and JUAN CARLOS discussed driving together to meet with a narcotics customer to supply him with an unknown amount of narcotics; and (b) BERNABE and JUAN CARLOS discussed pricing for one kilogram of cocaine—$31,500.

> **2.** **JUAN CARLOS and BERNABE Discussed Narcotics Stored in a Trap Compartment and MALDONADO Removed the Narcotics from the Trap for BERNABE**

75.     On or about June 30, 2021, at approximately 3:03 p.m. (TP 2 Session 152), BERNABE, using Target Phone 2, received a call from JUAN CARLOS, using Juan Carlos Phone 2. During the conversation:

a.      JUAN CARLOS asked, "Did you return it [the narcotics]? And everything?" BERNABE stated, "I haven't taken it [the narcotics] out of the car [Maldonado Vehicle 1]. I haven't take it out because I couldn"t take it out [of the trap in Maldonado Vehicle 1]. I'm going to try right now." BERNABE continued, "Yes son, and if it's not good [quality], we know the old man [narcotics customer] is very delicate [discerning about the narcotics he purchases] and he didn't like anything." JUAN CARLOS stated, "Well that's fucked up. So then he didn't give you anything [the customer did not provide BERNABE with any money]?" BERNABE responded, "Nothing, contrary I'm going to send him 500 [grams of narcotics] later. He doesn't have money."

76.     On June 30, 2021, at approximately 3:56 p.m. (TP 2 Session 165), BERNABE, using Target Phone 2, received a call from JUAN CARLOS, using Juan Carlos Phone 1.  During the conversation:

77.     JUAN CARLOS asked, "Where are you?" BERNABE stated, "In the house, son, I'm barely getting home." JUAN CARLOS responded, "Okay, why don't you send me a picture of what arrived of what they returned [JUAN CARLOS wanted to see the narcotics BERNABE had in his possession]." BERNABE stated, "I haven't taken it out [of the trap compartment] yet, I told Guero [MALDONADO] to come over with a board [tool] because I forced it in there [the trap inside of Maldonado Vehicle 1]." JUAN CARLOS stated, "Okay, take it [the narcotics] out and weigh it [the narcotics] and see how much to see how much to send. Send me a little video or if not just some pictures."

78.     At approximately 4:25 p.m., surveillance observed MALDONADO arrive at the BERNABE Residence.  MALDONADO opened the front passenger door of Maldonado Vehicle 1 and appeared to exert effort in an apparent attempt to retrieve something from the passenger side of the vehicle.

79.     Based on my training, experience, and familiarity with this case – including information provided by the CI, the above-referenced July 9, 2021, and August 23, 2021 seizures of wholesale quantities of cocaine, consensually recorded conversations, and prior and subsequent intercepted calls – I believe that, in the above calls: (a) JUAN CARLOS asked BERNABE to send JUAN CARLOS a picture of narcotics that BERNABE had, but BERNABE had not removed the narcotics from

43

a trap in his vehicle; (b) BERNABE asked MALDONADO to come to the BERNABE Residence with a tool to remove the narcotics from the trap compartment of Maldonado Vehicle 1. Based on the arrival of MALDONADO and the call discussed above, I believe that MALDONADO traveled to the BERNABE Residence to remove the narcotics from the trap compartment of Maldonado Vehicle 1.

### 3. BERNABE and MALDONADO Discussed a Narcotics Transaction and Method of Payment

80. On or about July 2, 2021, at approximately 4:01 p.m. (TP2 Session 218), BERNABE, using Target Phone 2, received a call from MALDONADO, using Maldonado Phone 4. During the conversation:

a. MALDONADO stated, "Look, I committed to one [kilogram of cocaine] and they [buyers] are barely going to pay me half [half of the cost of the kilogram of cocaine] . . . I'm going to lend [front]25 the other half. Do you understand me?" BERNABE asked, "But are they going to pay you what they owe you?" MALDONADO responded, "Yes. The one [narcotics customer] that wants it [kilogram of cocaine] is the neighbor and he just called me letting me know he has the money, but he would wait for me to call him. I'm going to visit that guy [neighbor/buyer] once he brings that thing [money]. Half of it [kilogram of cocaine] I'll lend it to the neighbor . . . they said they will pay it. But, that's why I want you

---

25 Based on my training and experience, and the training and experience of other law enforcement officers with whom I have consulted, narcotic traffickers often provide bulk quantities of narcotics to co-conspirators or customers and receive payment for the narcotics at a later time, a practice known as fronting.

to wait a little for me so if they tell me they want the half [kilogram of cocaine] . . . I can just send half [kilogram of cocaine]."

b.       Based on my training, experience, and familiarity with this case – including information provided by the CI, the above-referenced July 9, 2021 and August 23, 2021 seizures of wholesale quantities of cocaine, consensually recorded conversations, and prior and subsequent intercepted calls – I believe that, in the above exchange: (a) MALDONADO committed to selling one kilogram of cocaine to a buyer and wanted to front half of the kilogram, as the buyer only had enough money to pay for half at the time; (b) BERNABE confirmed with MALDONADO that MALDONADO and the BERNABE DTO would be paid in full at a later time for the whole purchase price of one kilogram of cocaine; and (c) MALDONADO confirmed the buyers would pay what they owed, but wanted to wait to collect on the full kilogram in case the buyers decided that they only wanted half a kilogram of cocaine instead.

**4.       BERNABE Instructed VALENCIA to Pick Up Narcotics, Wrap the Narcotics, and Hide the Narcotics in a Vehicle Trap Compartment**

81.       On or about July 31, 2021, at approximately 12:59 p.m. (TP2 Session 998), BERNABE, using Target Phone 2, called Individual D and VALENCIA, using Valencia Phone 3.  During this conversation:

a.       BERNABE stated, "Tell Claudia [VALENCIA] to go over to where the old man [narcotics supplier] is at." Individual D agreed. BERNABE added, "And bring back nine-nine balls [nine eight-balls of narcotics, or approximately 30 grams of narcotics]. The old man [narcotics supplier] is going to give her [VALENCIA] nine

45

balls. . . . Tell her [VALENCIA] to go in an Uber. . . ." Individual D agreed. BERNABE continued, "Or she can go in the car, just tell her [VALENCIA] to take a clean top [wrapping for the narcotics] so she can wrap that [the narcotics] carefully. . . wrap that [the narcotics] up carefully and put it inside the trap [place the narcotics inside a trap compartment in a vehicle]. . . . I'm going to go right now because we're going to take that [narcotics] to Aurora." Individual D said, "Let me put Claudia [VALENCIA] on the line so you can tell her. . . [Individual D was overheard in the background saying, 'Claudia [VALENCIA], come over here. Your dad is calling you.']"

b.     BERNABE stated, "Why don't you go to the old man's [narcotics supplier] and bring me nine-nine-nine [narcotics]. . . . I have nine balls [nine eight-balls of narcotics] there in a little room." VALENCIA replied, "Okay." BERNABE added, "Well wrapped and put it [the narcotics] inside the upper trap [trap compartment of the vehicle] . . . do you know what I mean?" VALENCIA confirmed, "Uh-huh." BERNABE stated, "Okay. Go and bring it [the narcotics] to me and then I'll stop by for the car. . . . I'm going to take it [the vehicle with the narcotics] over to Aurora."

c.     Based on my training, experience, and familiarity with this case – including information provided by the CI, the above-referenced July 9, 2021 and August 23, 2021 seizures of wholesale quantities of cocaine, consensually recorded conversations, and prior and subsequent intercepted calls – I believe that, in the above exchange: (a) BERNABE and VALENCIA discussed obtaining nine eight-balls, or approximately 30 grams of narcotics, from a narcotics supplier; and (b) BERNABE

46

instructed VALENCIA to conceal the narcotics by wrapping the narcotics and placing them inside a trap compartment installed in a vehicle and to deliver the cocaine to him so that BERNABE could take the vehicle with the narcotics to Aurora, Illinois.

### 5. BERNABE and UM-3238 Discussed a Potential Narcotics Purchase

82. On or about August 11, 2021, at approximately 10:46 a.m. (TP2 Session 1415), BERNABE, using Target Phone 2, received a call from an unidentified male FNU LNU (also known as "UM-3238"), using telephone number (XXX) XXX-3238. During this conversation:

a. BERNABE stated, "Hey, I'm here with my daughter [VALENCIA]. She's telling me that, I'm going to put her on the line so she can tell you how things are. They brought some things [narcotics]. How much does Guero [MALDONADO] owe you for the truck right now?" UM-3238 stated, "He owes me two thousand five hundred plus taxes but. . . it's about two hundred thirty so it's like two thousand seven hundred and some. . . . It was $2,500 for the truck, they owe me $2,500 for just the truck plus taxes."

b. BERNABE stated, "Listen, they've got work [narcotics]. Do you need work [narcotics] right now?" UM-3238 replied, "Ah, what's going on is that the guy [buyer] that's there. He hasn't answered me right now so I don't think that he's here." BERNABE stated, "Look, so then so then I've got my daughter [VALENCIA] next to me. My daughter, my daughter is real honest. I'm going to put her on the line

47

shortly and once she sells that [the narcotics] she will call you right away. Do you understand me what I'm telling you?" UM-3238 replied "Yes."

        c.     Based on my training, experience, and familiarity with this case – including information provided by the CI, the above-referenced July 9, 2021 and August 23, 2021 seizures of wholesale quantities of cocaine, consensually recorded conversations, and prior and subsequent intercepted calls – I believe that, in the above exchange: (a) BERNABE indicated to UM-3238 that BERNABE and VALENCIA were currently in possession of narcotics; (b) BERNABE inquired if UM-3238 was interested in purchasing narcotics in exchange for a debt owed by MALDONADO to UM-3238 for a truck; and (c) BERNABE told UM-3238 that VALENCIA would sell narcotics for the BERNABE DTO and re-pay UM-3238 for MALDONADO.

      **6.**     **UF-1 and VALENCIA Discussed a Narcotics Transaction and the Collection of Related Currency**

83.     On or about September 19, 2021, at approximately 11:16 a.m. (TP2 Session 2122), an unidentified female ("UF-1"), using Target Phone 2, called VALENCIA, using Valencia Phone 1. During this conversation:

        a.     UF-1 stated, "Cruz called a while ago to say he is already over there and that he is on his way already . . . . You should get close to the house so you can be on the alert, because you know Guero does not do anything without there being something in it for him [a cut of the narcotics sales], Claudia." VALENCIA replied, "Uh-hum . . . I'm already here in the house . . . I'm already on California and 47th."

48

UF-1 said, "Cruz already picked up the, the green stuff [marijuana] and is bringing it back. That's why I was worried, so you can grab it [the marijuana]. Because you know that Guero is a real asshole."

b.    UF-1 said, "Please turn that in already, Claudia. Please turn in whatever you have [money collected from prior narcotics transaction(s)]." VALENCIA responded, "Don't tell me they returned everything [narcotics]?" UF-1 stated, "I don't know how much they returned, because Cruz told him before returning that, that he didn't want to return because they had not liked that [the customers did not like the quality of the narcotics]." UF-1 added, "Before you turn in the money [money collected from narcotics transaction(s)], call your dad [BERNABE]. Because I think he wants to grab a little [narcotics] from there. I think he [BERNABE] is going to deliver ten [ten kilograms of narcotics] or I don't know how much . . . you still won't have enough. Did that old man, Guera's cousin pay you already?" VALENCIA responded, "He supposedly arrives today." UF-1 replied, "So you can tell Guero to send me what he agreed to send me, Claudia."

84.    Based on my training, experience, and familiarity with this case – including information provided by the CI, the above-referenced July 9, 2021 and August 23, 2021 seizures of wholesale quantities of cocaine, consensually recorded conversations, and prior and subsequent intercepted calls – I believe that, in the above exchange: (a) UF-1 and VALENCIA discussed the delivery of narcotics to VALENCIA's house to be used in a future transaction; and (b) UF-1 and VALENCIA

49

discussed collecting currency related to a prior narcotics transaction, in which the buyer requested a refund for the narcotics received.

## IV. CONCLUSION

85. Based on the foregoing, there is probable cause to believe that:

a. Beginning no later than on or about November 8, 2020 and continuing until at least on or about September 19, 2021, at Chicago, in the Northern District of Illinois and elsewhere, defendants JORGE LUIS MALDONADO BERNABE, JOSE ALFREDO MALDONADO-VALENCIA, also known as "Wero" or "Guero," CLAUDIA MALDONADO-VALENCIA, and JUAN CARLOS MALDONADO, also known as "Paya" or "Palla," did conspire with each other, and with others known and unknown, to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 846.

b. On or about November 22, 2020, at Chicago, in the Northern District of Illinois, and elsewhere, BERNABE, MALDONADO, and JUVENTINO SOTO-GARCIA knowingly and intentionally distributed a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

50

c.      On or about July 9, 2021, at Chicago, in the Northern District of Illinois, and elsewhere, ANTONIO CAMPUZANO-GARCIA knowingly and intentionally possessed with intent to distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

_____
Thomas Kropp
Task Force Officer
Federal Bureau of Investigation

SUBSCRIBED and SWORN
before me this 2nd day of November 2021.

_____
GABRIEL A. FUENTES
United States Magistrate Judge

51